BOHANNON, *Plaintiff in Error*, v. COMBS.

**Fraudulent Conveyances.**   A voluntary conveyance made by a debtor in embarrassed circumstances, is constructively fraudulent, and will be set aside at the instance of a creditor without proof of actual fraud.

*Error to Pettis Circuit Court.*—HON. WM. T. WOOD, Judge.

REVERSED.

The facts, as shown in evidence, were substantially as follows:   In 1864 Wm. E. Combs owned about 1,840 acres of land in Pettis and Morgan counties, and was largely indebted to various persons, much of the land having been bought on credit.   On March 5th, 1864, he and his wife executed a deed of trust, conveying the above land and assigning a lot of notes to Heard and Trigg, to secure $17,000 due to J. L. Stephens, administrator (and which was obtained to pay some of the debts of Combs to other parties). This deed included the land in controversy; and a part of the land conveyed was a tract in Morgan county, bought

by Combs from Perry and Jones, and for which he gave his note, with plaintiff Bohannon as surety, on which Perry and Jones obtained a judgment, which Bohannon paid off, on account of which Bohannon obtained his judgment against Combs, on July 27th, 1867, for $4,250, and under which he bought the land in controversy. The deed of trust to Heard and Trigg provided that the trustees might collect the notes and sell any or all of the lands at public or private sale, and apply proceeds on the debt secured, and when the debt was paid the deed should be null and void.

Soon after this deed was made a number of executions in favor of other creditors of Combs were levied on the land, and were prior liens to the deed of trust. The trustees, to protect their title, bought the lands at sheriff's sale, under an arrangement with Combs and Stephens, the latter advancing the money, $2,001, for that purpose. On the trial it was admitted that this purchase was in aid of the deed of trust, and the title acquired was only a security, and subject to the terms and conditions in the deed of trust. The trustees, co-operating with Combs, sold a large amount of the land, and paid off all of the secured debt except $2,500. Among others, the trustees sold the land in Morgan county, bought by Combs from Perry and Jones, to one J. P. Sheerer, of Ohio, for $12,280, of which $4,280 was paid in cash, $2,000 in a note, and the balance, $6,000, in the estimated value of a certain mill property in Ohio, to be conveyed to Wm. E. Combs. Combs and wife also executed to Sheerer a deed confirming this sale by the trustees, and warranting the title. Stephens, having made a settlement as administrator of the estate of Davis, turned over to one of the heirs, Daniel G. Davis, Jr., the balance of $2,500 unpaid, and Combs arranged with Daniel G. Davis, Jr., to extend the time and take new notes for the payment of the $2,500.

Combs then made several trips to Boonville (where Trigg and Stephens lived), urging them to release the land, as they had been satisfied, and soliciting them to make a

quit-claim deed to his wife. Having learned that Davis considered himself secured, Trigg and Stephens, on September 14th, 1868, executed a quit-claim deed which Combs presented to them, by which, in consideration of $1, they " remised, released and forever quit-claimed to H. L. Pigg, trustee for Nancy H. Combs," 475 acres of land (including the land in controversy). Trigg and Stephens both testified that they received no consideration for this deed, except the previous satisfaction of the debts secured; that neither Mrs. Combs nor Pigg paid them anything whatever; that they never saw nor had any transaction with either of them; that the only purpose in making the quit-claim was to acknowledge satisfaction of the debt, and to release the land from the incumbrance of the deed of trust; and that they made it to Mrs. Combs simply to comply with the request of Mr. Combs, who was the only person they saw or dealt with in the matter. On the same day Nancy H. Combs and Pigg, as her trustee, executed a deed of trust on the same land to John Heard, to secure the $2,500 due to Davis.

In the meantime judgments had been rendered against Wm. E. Combs, as follows: On February 27th, 1867, in favor of Wright & Co., for $1,362.04 with ten per cent; on July 27th, 1876, in favor of Bohannon, plaintiff, for $4,250 with ten per cent; and on August 2nd, 1867, in favor of Hughes and Wasson, for $675.98. Upon these judgments a number of executions had been issued and returned unsatisfied. There had also been issued and returned unsatisfied prior to the quit-claim deed to Mrs. Combs, three other executions against Wm. E. Combs, in favor of different persons, for about $700, and afterward there were issued and returned unsatisfied five other executions against Wm. E. Combs, on still different debts, for about the same amount. Some time after the quit-claim was made to Mrs. Combs, Wright & Co. procured the fifth execution on their judgment against Combs and levied on a large amount of land as his property, including the land in controversy, and advertised it for sale. Combs went to a friend, Collier, ex-

plained the situation, and induced him to undertake an adjustment with Wright & Co. Collier went to St. Louis, but failed to accomplish anything with Wright & Co., who referred the whole matter to their attorney, Burke. Collier then saw Combs and agreed to assist him. Collier, Combs and Burke met in Sedalia on the day the land was to be sold, and it was then arranged that Burke should be paid $200 in cash, and that Combs, with Collier as surety, should execute a note to Burke for $2,000, to be held until the Wright & Co. debt was paid, and that Collier should buy the land at the sheriff's sale, and hold the same as security for what he might pay. Thereupon Combs paid Burke $50, and Collier paid the other $150 for him, and Combs and Collier executed the note for $2,000. Collier went to the court house—Combs went the other way—and Collier became the purchaser of the land (including that in controversy). Combs also turned over to Collier a number of notes taken in payment of portions of the land which had been sold. Collier testified that he only bought the land in to aid Mr. Combs, and as security for himself, and never claimed it otherwise.

Soon after this Combs, Collier and Davis met, and the latter was informed that the Collier title was superior to his deed of trust from Mrs. Combs, but that the same was held as security against the payments and liability of Collier, and if he, Davis, would advance $1,500 more, to be used in paying Wright & Co., that when Collier was fully re-imbursed and released, he, Davis, should have the same security which Collier held. Davis advanced the $1,500, and received from Collier the above mentioned notes. About the same time Collier received on the order of Combs $500 from a party owing Combs for land, and Combs turned over to Collier a lot of hogs, which the latter took to St. Louis and sold, and out of these sums of money paid the Wright & Co. debt, took up the $2,000 note and turned it over to Combs.

In the meantime, Collier had paid to Combs consider-

able sums in cash, and at his request had paid off several debts owing by Combs, thus making an excess of $793 that Collier had paid out to and for Combs, over what he had received, and as security for which he continued to hold the land bought at sheriff's sale.

In the meantime, also, Combs had sold the mill property in Ohio acquired from Sheerer, and obtained notes to the amount of $3,000 for the same; these he turned over to Davis. Matters remained in this way for some time, and Davis, not realizing on the Ohio notes, and Combs claiming that they had been turned over as a payment, and that they satisfied the debt to Davis, a controversy arose between them, and Collier being, to use his own language, "between two fires, and seeing no other way out, fell back upon the original agreement that Davis should have his title as security," and made a quit-claim deed to Davis of all the land bought at sheriff's sale, Davis paying him the balance of $793 due by Combs to Collier.

Soon after this, Combs, jointly with his wife and Pigg as trustee, O. A. Crandall, as their attorney, brought suit against Davis, alleging that the title acquired by Collier was only a security, and that Davis held it as such along with his deed of trust, and that the debts secured had been paid by the transfer of the Ohio notes, and asking to have the deed of trust declared satisfied, and to divest from Davis the title to all the land, and to vest it in Pigg, trustee for Mrs. Combs. Upon a trial the issues were found against Davis, and a decree entered vesting in Pigg, as trustee for Mrs. Combs, the title to about 920 acres of land, being the land in the quit-claim from Trigg and Stephens, and about 445 acres in addition, and including the land in controversy.

In all these transactions, neither Collier nor Davis had anything to do with Mrs. Combs or Pigg, nor ever received anything from either of them, and received nothing except the hogs turned over by Combs to Collier, and the proceeds of sales of parts of the original tract of land.

In the meantime, in 1867, Bohannon had one execution on his judgment returned unsatisfied, and on April 24th, 1871, a second execution was issued and levied on the land, as the property of Wm. E. Combs, and at the sale Bohannon bought it in, of which all but 381 acres had previously been sold to other parties.

Concerning these transactions, Collier testified that he and Combs had talked about the probability of an attack on Mrs. Combs' title as fraudulent, and Combs said he expected to pay all his just debts, but that if he hadn't had the title placed as it was, his creditors would have taken the land, and he would have had nothing left to pay with. Collier said that the only debts Combs seemed to be anxious to get rid of were the security debts on sheriff's bond.

Both Mr. and Mrs. Combs gave evidence to show that the lands had been bought with money received by Mrs. Combs from the estates of her father and mother. It showed that twenty-five or thirty years before the trial they had received a negro girl from Mrs. Combs' father, which Mr. Combs sold for $500. They also claimed to have received $500 more from his estate, but the evidence showed that Wm. E. Combs was himself the administrator, and that he had sold the land to pay the debts, and that on final settlement there was only a balance of $162, which was to be divided amongst nine heirs. They claimed that Mrs. Combs had received $2,000 from the estate of her mother, which was used in purchasing land; and then on cross-examination Mr. Combs admitted that the share of each heir was less than $600, and that he got the share of two of the heirs for debts they owed him, and that thus he got his wife's and two other shares, amounting to nearly $2,000. Further on in their examinations, Mr. Combs claimed to have made an entirely different use of this money, and Mrs. Combs didn't know what was done with it.

In his testimony Mr. Combs admitted his indebtedness, as alleged by plaintiff, to the amount of $12,000 or $14,000,

and that he owed many security debts besides, and claimed that when he made the deed of trust to Heard & Trigg his assets were worth $40,000. He admitted that all payments were made out of sales of land (except the money for the hogs), and that the $2,500, for which Mrs. Combs gave her note and deed of trust, was paid in that way. He was permitted, against objection of plaintiff, to testify as to payments of his debts after the quit-claim deed to Mrs. Combs, and plaintiff excepted. He stated that the land in suit was a fourth in value of all the land he had owned. He admitted the Collier and Davis transactions, as stated.

Mrs. Combs testified that she paid nothing to Trigg, Stephens nor Heard; that she did not know of the making of the deed to Pigg, as her trustee, until she was called on to sign the note to Davis; she had no money at the time. After the deed to her everything went on as before. Mr. Combs managed the farm, sold the crops and used the money. The court, against the objection of plaintiff, asked this witness if anything was said about defrauding creditors at the time the deed was made to her, and plaintiff excepted. The witness stated that she never heard anything about defrauding creditors in connection with that deed; that Mr. Combs was much entangled with the debts, and they paid as fast as they could. "I felt if the land had been taken then, we would have had nothing left to pay with."

Defendants gave evidence tending to show that plaintiff's judgment was paid before he bought the land, but it is not deemed necessary to insert this.

*G. C. Heard* and *Geo. P. B. Jackson* for plaintiff in error.

*Crandall & Sinnet* and *Draffen & Williams* for defendants in error.

SHERWOOD, J.—This was a proceeding to set aside as fraudulent certain deeds and a judgment which place the

title to certain lands in Pettis county, formerly belonging to Wm. E. Combs, in defendant Pigg, as trustee for Mrs. Combs, and vest it in the plaintiff, which land plaintiff had purchased at execution sale on a judgment against the defendant Wm. E. Combs. The evidence is voluminous. We shall not discuss it in detail, but inasmuch as a digest of it will accompany this opinion, we shall content ourselves with stating the conclusion which we have reached, that the cause was heard and determined on an entirely incorrect theory. The conveyance to Mrs. Combs, we are satisfied, was a voluntary one, and if so, there was no necessity in order to plaintiff's success that an actual fraudulent design as to the existing creditors of Combs, should have been proven. Combs was largely indebted and in very embarrassed circumstances, and his intention was evidently to hinder and delay his creditors for a time at least; to put off paying them to a "more convenient season," and so arrange his property as to place it beyond the reach of ordinary legal process, and so that it would inure to the benefit of his wife. Arrangements of this character, when made by a debtor situated as was Combs, are at best constructively fraudulent, and this is sufficient to overturn any mere voluntary conveyance. *Eddy v. Baldwin*, 32 Mo. 369. Bohannon's case is one of peculiar hardship, he was the surety of Combs on two notes given for land in Morgan county, Combs transferred the land without having paid for it, and Bohannon being sued had the notes to pay, while Combs employed the proceeds of the land as he saw fit.

We think that the ends of justice, equity and good conscience will be more nearly attained if this cause is heard again and determined upon the correct theory. We, therefore, reverse the judgment and remand the cause. All concur.